[No. 8505.]

## SHEMWELL v. THE PEOPLE.

1. CRIMINAL LAW—*Verdict.* A verdict finding the accused guilty of "obtaining money by false pretenses as charged in the first count of the information," is not a special verdict, nor incomplete. The of-

fense is well described under the act of 1891 (Laws 1891, 125, sec. 4, Rev. Stat., sec. 1849). (153.)

Even without any attempt to name the offense the verdict would have been technically sufficient, as it clearly manifests the intention of the jury. (153, 154.)

Information for obtaining both money and other personal property by false pretenses. Verdict guilty, and "the value of the property so obtained $5,000." Whether the jury included in the finding of value the money obtained, is immaterial. Money is as much property as are other personal goods. (154.)

2. ——*False Pretenses—Evidence.* The false pretense being that the prisoner had title to certain lands, *held*, it was not required that the people should prove title in another. It is sufficient if this appears by the whole evidence. (154.)

3. ——*Information Construed.* Information charged that the accused "claimed to own, and have the right to sell," certain lands. *Held*, to import that the accused represented that the title was vested in him, and that he had power, right and authority to convey the lands, by virtue of the title, and not by other right or authority. (155.)

4. ——*Obtaining the Property—Goods Under Chattel Mortgage,* which the accused assumed, were obtained by his false representations that he had title to certain land for which the goods were exchanged. That the goods were afterwards sold under the mortgage is no defense to a prosecution for the false representation. The transaction is to be treated as a sale for cash, and he is not to be heard to say that he obtained nothing. (156.)

5. ——*Evidence — Produced on Cross-Examination of Accused.* Evidence going to establish a phase of the accusation does not lose its substantive character by being brought into the case upon the cross-examination of the accused, and his subsequent contradiction by witnesses sworn in rebuttal. (156, 157.)

6. ——*Order of Proof.* Whether evidence in chief shall be received in rebuttal is within the sound discretion of the court. (157.)

7. ——*Instructions—Construed.* The court charged that if defendant "with intent to defraud" the prosecuting witness, did by false representations specified, obtain from the prosecutor the goods and money mentioned in the information, they should convict. *Held*, that the phrase "with intent to cheat and defraud," runs through, relates to, and characterizes all the several acts and representations referred to; that the jury could not have been misled into supposing that they were relieved from finding every material allegation of the information, beyond reasonable doubt, before they could render a verdict of guilty. (158, 159.)

*Error to Denver District Court.* Hon. JOHN A. PERRY, Judge.

Mr. HARRY S. SILVERSTEIN, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, Mr. RALPH E. C. KERWIN, Assistant Attorney General, for The People.

Mr. JUSTICE GARRIGUES delivered the opinion of the court.

The evidence shows that in the fore part of March, 1914, one George W. Gardner held a lease upon and conducted the Harvard Hotel in Denver; that the furniture and personal property in the hotel belonged to him, and was worth some fifteen or twenty thousand dollars, upon which the owner of the building held a chattel mortgage to secure the payment of a note for $5,100.00, and to whom he also owed some eighteen hundred or two thousand dollars for rent then due. Gardner told Cogdell and Roberts, real estate agents in Denver, that if they had an opportunity, they might trade his equity in the hotel furnishings for land, and March 13, 1914, Cogdell took defendant Shemwell, who claimed to own 160 acres of land with water in Conejos county, worth $12,000.00, up to look over the hotel property with a view of making a trade. Shemwell represented that the land was free and clear of all liens; that he owned it, and that the title was good. The next day, March 14th, a written contract was entered into and signed between Gardner and Shemwell, at the real estate office, in which Gardner agreed to convey the furniture and personal property of the hotel to Shemwell, for the 160 acres of land and water, Shemwell to assume the chattel mortgage on the furniture, and Gardner to pay the rent up to the first of April, and give Shemwell his note for $1,500.00 due in one year, secured by a trust deed back on the 160 acres of land; also to secure for Shemwell, from the landlord, an extension of the hotel lease, and a renewal of the chattel mortgage for three years; each party to deposit with the real estate firm as earnest money, $500 in cash. Gardner deposited his $500 in cash, but Shemwell gave them his check for

that amount, which was returned marked "short." On the 16th the landlord promised he would accept Shemwell as a tenant, extend the lease and renew the chattel mortgage; but on the 17th changed his mind and refused to do so. This rendered the written contract impossible of performance, it was mutually abandoned, no action was ever taken under it, and it has no importance in the case except in explanation of the transaction. The following day, the 18th, at the request of Shemwell, the parties met in the real estate office, where it was mutually agreed that so far as the written contract was concerned, the trade should be abandoned and declared off. Shemwell insisted, however, that he wanted the furniture and would trade the land for it, subject to the chattel mortgage; but did not want the lease, or a renewal of the chattel mortgage, as he did not care to operate the hotel. He stated that he had a certified check for $5,250.00 with which he would either pay off the mortgage or let it go to foreclosure sale, bid in the property, and move it to his hotel at Carlsbad in the mountains. A new oral agreement was entered into, under the terms of which Shemwell made, executed and delivered to Gardner his warranty deed for the 160 acres of land and water, in consideration for which Gardner made and delivered to him a bill of sale of all the hotel furniture and chattel property, subject to the mortgage, which Shemwell assumed and agreed to pay. In addition to this, and as a part of the consideration, Gardner gave Shemwell his note for $1,500.00 due in one year from date, secured by a deed of trust back on the land, and also agreed that Shemwell should have the $500.00 deposited by Gardner with the real estate firm, the intent and purpose being to place in Shemwell the means of paying off the $2,000.00 which Gardner owed for rent, so that Shemwell could take the furniture free from the landlord's lien. All the papers necessary to consummate the transaction were duly exe-

cuted, exchanged and delivered; and Gardner, supposing it was a closed transaction, sent the deed to Conejos county for record—of which Shemwell was then informed —and delivered the bill of sale, trust deed and note to Shemwell, telling him that he delivered to him the possession of the hotel. Shemwell requested Gardner to return and take possession of the hotel property for him, and remain in charge until the first of April.

Shemwell did not own the land and Gardner obtained no title by virtue of the Shemwell deed, or from any other source. The legal title, it seems, stood in one Eaton, and Shemwell had no authority to execute a deed for him, and in fact did not pretend to do so, as the warranty deed was executed in his own name, and not for or on behalf of Eaton or anyone else. His representations that he owned the land, that it was free and clear of all liens and encumbrances and that he had a good title, were false. On the 19th, Eaton, Shemwell and Cogdell met in one of the banks in Denver, where Shemwell attempted to have Eaton quit-claim the land to Gardner, which Eaton agreed to do in consideration of the payment to him of $2,000.00. Shemwell then represented that he had a Kansas City check or draft for $1,500.00 that he would turn over, which with the $500.00 held by Cogdell, would make up the $2,000.00 required by Eaton, but on examining the check, Eaton discovered that while the figures were $1,500.00, the writing was fifteen dollars. He and Shemwell then entered into an escrow agreement by which Eaton executed a deed to Gardner for the land and Shemwell endorsed to Eaton the $1,500.00 note and trust deed given him the day before by Gardner and these papers together with the abstract of title to the land, which Eaton held, were placed in an envelope and left with the bank, with directions that upon the deposit of $500.00 to Eaton's credit, it should deliver the note and trust deed

to him, and turn over his deed, with the abstract, to Gardner.

After the trade was closed between Shemwell and Gardner on the 18th, as mentioned, Gardner took no part in the subsequent transactions, and knew nothing of them. Subsequent to the exchange of papers in the real estate office on that date, Gardner returned to the hotel, took possession for Shemwell, and remained in charge for him until March 23rd, when the landlord took possession under the chattel mortgage, and advertised the property for sale. On March 25th, Shemwell, representing that Gardner wanted to get a loan on the land, obtained possession of the abstract, without complying with the escrow agreement. He then exhibited it to Cogdell and represented to him that the agreement had been carried out; that the Eaton deed to Gardner had been sent to Conejos county for record; that he, Shemwell, wanted to pay off the chattel mortgage, and move the hotel property to Carlsbad; but that the expense of foreclosure had been so great that in addition to his $5,250.00 check, he would need the $500.00 held by Cogdell, and asked Cogdell to turn it over to him, which was done. The Eaton deed had not been taken out of escrow, neither was Gardner attempting to get a loan on the land. Shemwell obtained possession of the abstract by misrepresentations, and when the escrow agreement was not complied with, Eaton withdrew and destroyed his deed.

The result of these dealings was that Shemwell obtained $500.00 of Gardner's money together with a bill of sale conveying to him Gardner's right in the hotel property, and Gardner received nothing.

May 11, 1914, Gardner, after ascertaining that he had obtained no title to the land, because Shemwell had none, laid the matter before the District Attorney, who filed an information against Shemwell, the first count of which charges in substance that with intent to cheat and

defraud Gardner, Shemwell did falsely and feloniously pretend and represent to Gardner that he, Shemwell, owned and had full power, right and authority to sell and convey the 160 acres of land in Conejos county, together with the water of the value of $12,000.00 which he offered to sell, bargain and exchange to Gardner for $500. in money, and the furniture, goods, chattels and personal property situated in the Harvard Hotel of the value of $15,000.00, subject to a chattel mortgage of $5,100.00, and that Gardner believing the said false and felonious pretenses and representations, made by Shemwell, and relying thereon, and being induced and deceived thereby, did pay over and deliver to Shemwell the sum of $500.00 in money, and did also convey and deliver to him the furniture situated in the Harvard Hotel of the value of $15,000 of the personal property, goods and chattels of Gardner, and that Shemwell did falsely, feloniously, designedly and knowingly, by means of said false pretenses, obtain from Gardner $500.00 in money, and the furniture of the Harvard Hotel of the value of $15,000.00, of the personal property of Gardner, whereas in truth and in fact Shemwell was not the owner of the 160 acres of land, nor the water right, nor any interest therein and had no right, power or authority to sell and convey the same, all of which he, Shemwell, at the time of making thereof, knew to be false, felonious and untrue.

The jury returned the following verdict:

"We, the jury, find the defendant, J. H. Shemwell, guilty of obtaining money by false pretenses as charged in the first count of the information herein; and find the value of the property so obtained to be $5,000."

The statute, section 4, page 125, S. L. 1891, provides:

"If any person or persons shall knowingly and designedly, by any false pretense or pretenses, obtain from any other person or persons any chose in action, money,

goods, wares, chattels, effects or other valuable thing whatever, with intent to cheat or defraud any such person or persons of the same, every person so offending shall be deemed a cheat, and upon conviction, shall, where the property obtained is over the value of twenty dollars, be imprisoned in the penitentiary not to exceed ten years; and where the value of the property obtained is twenty dollars or less, be fined in any sum not exceeding one thousand dollars, or imprisoned in the county jail not to exceed six months, or both; and in all cases where the value of the property obtained is twenty dollars or less, justices of the peace within their several counties, shall have jurisdiction of the above offense, subject to the right of appeal, as provided by law.''

2.   Complaint is made that the verdict is special; that it does not find all the essential elements necessary to constitute the crime charged, and that it is inconsistent with the evidence.

The verdict is not incomplete, nor is it a special verdict. It is general, with an attempt to name the offense. Usually crimes are denoted by some word having a well defined meaning, as murder, rape, mayhem, burglary, larceny, forgery and the like and where the crime charged is so designated, it is customary, though not necessary, to insert the name in the verdict. We find that Cyc., the Pacific Digest, Mills' Colorado Digest, Courtright's Colorado Digest, Bouvier's Law Dictionary and Ruling Case Law, designate the crime here charged as ''False pretenses,'' while Modern American Law calls it: ''Obtaining property by false pretenses.'' So the offense appears to have a well defined name in the law books, although one will often hear it called: ''Obtaining money under false pretenses.''

Had the jury found defendant guilty as charged in the first count of the information, without attempting to name or denote the offense, the verdict would have been

technically correct. But as it is, there is no confusion or ambiguity in the verdict. The intention of the jury is plainly manifested. They found defendant guilty under the first count of the information, which charged the offense generally denoted, "False Pretenses." Because the jury undertook to name the offense and called it: "Obtaining money by false pretenses," instead of "False Pretenses," is of no consequence, can be treated as surplusage, does not affect the intent of the jury and in no way prejudices the substantial rights of the defendant. *West v. People*, 60 Colo. 488, 156 Pac. Rep. 139. Neither is there any discrepancy between the verdict and the evidence. The trouble with counsel's contention in this regard lies in the fact that he does not recognize money as property. The gist of the offense was obtaining from Gardner, with intent to cheat and defraud him, his money and hotel furniture—both of which were property—by false pretenses. In case of a conviction, the jury were required to find the value of the property so obtained. It is clear from the verdict that they did not find him guilty of obtaining the money only, and if they did not include it in the value of the property obtained, that is a matter of which the defendant cannot complain. Whether they did or did not include the money with the furniture in their findings of value of the property so obtained, does not render the verdict inconsistent with the evidence, because both are property and the evidence sustains the verdict either with the money included or excluded.

3. It is charged that Shemwell represented that he owned, and had full power, right and authority to sell and convey the land, and it is urged in argument that the prosecution failed to prove that he did not own the land, and that he had no authority from the owner to convey it. It was not necessary for the people to prove title in another, as in larceny. It was sufficient if the whole evi-

dence on the trial established that defendant had no title in himself when he gave Gardner the warranty deed, and this clearly appeared. In fact he admitted on the witness stand that he had no title, but claimed authority from Eaton, who held the title, to execute the deed for him. It is argued in this connection that the information charges two separate things which the people had the burden of proving beyond a reasonable doubt: First, that the defendant did not own the land; and, second, not being the owner, that he had no authority from the owner to convey the property. We cannot place such a construction upon the information. It alleges that defendant claimed to own, and have the right to sell and convey the land described in his warranty deed, and the only legitimate inference that can be drawn from such an allegation is, that he represented that the title to the property was in him, and that by virtue of his ownership of the property, he had full power, right and authority to make, execute and deliver a warranty deed to Gardner. So we think but one thing was charged in the information, viz.: that defendant represented that he owned the property, and as owner had the right to sell and convey it. But if we concede defendant's contention as to the charging part, it was his duty to present the evidence, if any he had, in support of the contention that he had such authority, and if upon a consideration of all the evidence on the trial, the jury had a reasonable doubt of his guilt, it was their duty to acquit him. He presented no such evidence. The deed was executed for himself, not for another; he claimed to be the owner, not acting for the owner, and the evidence shows that he did not own the property and there is no testimony that he had authority from the owner to make and deliver the deed.

It is contended in argument that the evidence fails to show that Shemwell obtained anything. The hotel property was exchanged for the land, and it is was the

intent of the parties that the exchange should take effect, not in the future, but immediately upon the delivery of the bill of sale and deed. The deal must be treated the same as if it were a cash transaction in which there was an absolute sale of the hotel furniture. A bill of sale is an instrument used to evidence the transfer of personal property, and as between the parties to this transaction Gardner's title in the personalty passed to the defendant on the 18th of March, upon the delivery of the bill of sale.—35 Cyc. 336; Williston on Sales, Sec. 343; *Brill v. Christy,* 7 Ariz. 217, 63 Pac. 757; *Tome v. Dubois,* 6 Wall. 548, 18 L. Ed. 943; *Haines v. McKinnon,* 35 Or. 573, 57 Pac. 903.

Under the facts and circumstances as disclosed by the evidence in this case, we think the defendant obtained the hotel furniture from Gardner within the meaning of the criminal statute.

5. Defendant was asked on cross-examination whether or not he had told certain persons who asked him what he was going to do with the furniture he had purchased, that he had a check for $5,250.00 with which he was going to pay off the chattel mortgage, and move the furniture to his hotel at Carlsbad in the mountains, or that he might let it go to chattel mortgage sale, and run it up to $10,000.00 on the landlord, and then let him have it and pocket the difference. He denied making these statements and said that he did not own such a hotel in the mountains, or anywhere else. Over defendant's objection these persons to whom such statements were alleged to have been made, were permitted, on rebuttal, to testify that they had had such conversations with him, and to relate them in detail. It is here urged that this was prejudicial error because it is said to be an attempt to impeach the defendant on an immaterial matter, and because the witnesses were permitted to relate the alleged conversations, instead of having the questions

which were propounded to defendant, read to them and being required to answer whether they had had such conversations with him or not. This evidence was not immaterial. They were statements claimed to have been made by the defendant, a party to the action, which tended directly to support the contention of the people that the written contract was abandoned by mutual consent, and an oral agreement entered into on the 18th day of March. The people could have introduced evidence of these alleged statements of the defendant in chief. The fact that they did not, and that defendant on cross-examination denied having made such statements, did not destroy or change the substantive character of this evidence. Whether the court should have permitted it to be introduced on rebuttal, was a matter that lay within its sound discretion, and unless such discretion was abused so as to prejudice the rights of the defendant, it would not be reversible error. We cannot see how, under the circumstances of this case, the introduction of this evidence on rebuttal, instead of in chief, in any manner prejudiced the rights of the defendant.

6.  The court instructed the jury that if they found and believed from the evidence beyond a reasonable doubt that the defendant did, with intent to cheat or defraud Gardner, falsely pretend and represent to him that he, Shemwell, owned and had full power, right and authority to sell and convey the land, and offered to bargain, sell and exchange it to Gardner for $500.00 in money, and the Harvard Hotel furniture, of the value of $15,000.00, or some value, and Gardner believing said false pretenses and representations so made by the defendant, if you find that he did make them, and relying thereon and being induced thereby, did pay over and deliver to the defendant $500.00 in money, of the value of $500.00, or some value, and did also convey and deliver to him the hotel furniture of the value of $15,000.00, or some value, the

personal property of Gardner, and that the defendant did by means of said false pretenses aforesaid, obtain from Gardner $500.00 in money of the value of $500.00, or any other sum, of some value, and the hotel furniture of the value of $15,000.00, or of some value, the personal property of Gardner, and that in truth and in fact defendant was not the owner of the land, and had no right, power or authority to sell and convey it, all of which representations and pretenses defendant, at the time of making thereof, if he did make them, knew to be false and untrue, then you should find defendant guilty as charged in the first count of the information, otherwise you should acquit him. This instruction appears to be substantially a repetition of the information. Complaint is made that it does not tie the obtaining of the property from Gardner up with the intent to cheat and defraud him of the same; that is to say, the intent to cheat and defraud, as the instruction is worded, relates to the representations and not to the obtaining of the property; also that repeating the identical language of the information, which charges the facts to be true, has the appearance in the instruction, of telling the jury that certain facts charged in the information are true. The statute defining the offense of false pretenses provides that if any person shall knowingly and designedly, by false pretenses obtain from another person any property with intent to cheat or defraud such person of the same, he shall be guilty of the offense, and there is no doubt it is the obtaining of Gardner's property by means of false pretenses, with intent to cheat and defraud him of the same, that constitutes the gist of the offense, and if the jury were misled, and did not so understand the instruction, the cause should be reversed. It tells the jury that if they find and believe from the evidence on the trial beyond a reasonable doubt, that defendant with intent to cheat and defraud Gardner, did by certain false pre-

tenses obtain from him the property, that they should convict, otherwise acquit the defendant. We think the phrase "with intent to cheat and defraud Gardner," occurring at the beginning, runs through and relates to all of the instruction, and while it might have been clearer if the intent had been more closely identified with the obtaining of the property, there can be no doubt the jury understood the obtaining of the property by false pretenses must have been with the intent to cheat and defraud the owner. With regard to the false pretenses, the court inserted twice in the instruction complained of: "if you find that he did make them," which in a large measure answers the criticism of the instruction. Had the court told the jury that the burden of proof was upon the people to establish by the evidence on the trial, beyond a reasonable doubt, the material allegations of the complaint, and then explained to them what the material allegations were that had to be so established, it would no doubt have been better. We do not think, however, that the jury were misled by this instruction, or understood from it that they were relieved from the duty of finding from the evidence that every material allegation was established beyond a reasonable doubt, before they could convict. They must have understood that in order to arrive at a verdict of guilty, they had to find and believe from the evidence beyond a reasonable doubt that the defendant obtained the property from Gardner by means of false pretenses, with intent to cheat and defraud him. The judgment will be affirmed.

*Affirmed.*

Chief Justice GABBERT and Mr. JUSTICE SCOTT concur.

Decided June 5, A. D. 1916. Rehearing denied December 4, A. D. 1916.